## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| BROOKS AUTOMATION, INC.  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| v.  ) | Civil Action No. _____ |
| ) | |
| PERSIMMON TECHNOLOGIES  ) | |
| CORPORATION  ) | Jury Trial Demanded |
| ) | |
| Defendant.  ) | |
| _____) | |

## COMPLAINT

1.      Plaintiff Brooks Automation, Inc. ("Brooks Automation"), by its undersigned counsel, brings this action for permanent injunctive relief and for monetary damages, and alleges, upon knowledge with respect to itself and its own acts, and upon information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

2.      This action arises out of Persimmon Technology Corporation's ("Persimmon") willful infringement of Brooks Automation's patent and purposeful misappropriation of Brooks Automation's valuable trade secrets and confidential information in order to directly (and illegally) compete with Brooks Automation in the market with respect to the manufacture and sale of robots used in the manufacture of various sophisticated products, such as semiconductors and liquid crystal displays.

## PARTIES

3.      Plaintiff Brooks Automation is a Delaware corporation with its principal place of business at 15 Elizabeth Drive, Chelmsford, Massachusetts.  Brooks Automation is a leading

worldwide provider of automation and cryogenic solutions for multiple markets including

semiconductor manufacturing and life sciences.

4.      Upon information and belief, Defendant Persimmon is a Delaware corporation

with its principal place of business at 200 Harvard Mill Square, Suite 110, Wakefield,

Massachusetts.  Persimmon is engaged in designing, developing, making, using, selling and

offering for sale certain robotics, vacuum modules, and automation systems.

## JURISDICTION AND VENUE

5.      This is an action for patent infringement arising under the patent laws of the

United States, Title 35 of the United States Code, and for various other claims including trade

secret misappropriation, breach of fiduciary duty, tortious interference, unjust enrichment, and

deceptive trade practices arising under Massachusetts state law.  This Court has subject matter

jurisdiction over Brooks Automation's patent infringement claim pursuant to 28 U.S.C. §§ 1331

and 1338. This Court has supplemental jurisdiction over Brooks Automation's state law claims

pursuant to 28 U.S. Code § 1367(a).

6.      This Court has personal jurisdiction over Persimmon because, among other

things, Persimmon transacts business in this District, including making, using, selling and/or

offering for sale the infringing products within this District.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) because

Persimmon transacts business in this district and is subject to this Court's personal jurisdiction

with respect to this civil action.

## FACTUAL ALLEGATIONS

### *Brooks Automation's Intellectual Property*

8.      Brooks Automation is an innovator in the field of automation and a leading

worldwide provider of manufacturing solutions for multiple markets, including semiconductor

manufacturing.  Semiconductor manufacturing requires the use of high-precision automation tools as well as reliable, predictable high performance equipment to transport silicon wafers within clean and controlled environments throughout the various semiconductor manufacturing process steps.  Brooks Automation offers a full suite of automated handling solutions, available either as standalone components or as part of an integrated system, allowing silicon wafer transfer in both vacuum and atmospheric conditions.

9.      One standalone component of the automated handling systems offered by Brooks Automation is the "vacuum robot."  Vacuum robots are used to transfer sensitive materials during the semiconductor manufacturing processes that take place in vacuum chambers.  The equipment operating in these vacuum environments must be specially designed to be highly accurate and reliable, while maintaining a clean vacuum environment.  This requirement creates several significant design challenges.  Brooks Automation is a world leader in designing such vacuum robots and, as such, has expended significant resources in the research and development of novel technologies for use in such devices.

10.     One of Brooks Automation's signature product lines is the MagnaTran® Vacuum Robots family of products.  Brooks Automation's MagnaTran® Vacuum Robots consist of a concentric-shaft rotational drive system.  Some MagnaTran® Vacuum Robots are also equipped with a Selective Compliance Articulated Robot Arm (SCARA) that can be rotated in a radial plane to transfer manufacturing materials, like silicon wafers, from work station to work station. With over 10,000 units installed worldwide, the MagnaTran® Vacuum Robot is the world standard in vacuum robot technology.   These state-of-the-art vacuum robots, designed specifically for tool automation in semiconductor wafer processing, flat panel display production, and other complex manufacturing environments, enable Brooks Automation's

customers to ensure that materials can be transported throughout the assembly process without incurring damage.

11.     As a pioneer in vacuum robots, Brooks Automation has undertaken significant efforts to protect its intellectual property since its inception.  For example, Brooks Automation has a long history of vigilantly maintaining the confidentiality of its trade secrets and confidential information by requiring its employees, partners and vendors to sign non-disclosure agreements, adopting and enforcing several written policies regarding its confidential information, password protecting and limiting access to its computer systems, and implementing stringent physical security measures in its facilities.  For example, as set forth in Brooks Automation's Standards of Conduct, Brooks Automation safeguards its proprietary information by marking information accordingly, keeping it secure, and limiting access to those who have a need to know in order to do their jobs.  A Brooks Automation employee's obligation to preserve the confidentiality of proprietary information continues even after employment.

12.     Brooks Automation has also obtained several hundred patents directed to several of its technologies, including technologies in the semiconductor automation space.  One of those patents is at issue in this litigation.

13.     On February 24, 1998, Brooks Automation obtained United States Patent No. 5,720,590 (the "'590 Patent") from the United States Patent and Trademark Office.  The duly and legally issued '590 Patent is entitled "Articulated Arm Transfer Device," and lists Christopher Hofmeister as the sole named inventor.  The '590 Patent claims various devices used for transferring materials during the semiconductor manufacturing process.  For example, the '590 Patent claims, among other things, a transport apparatus having a movable arm assembly

operably connected to a drive mechanism. A true and correct copy of the '590 Patent is attached hereto as Exhibit A.

14.     The '590 Patent is assigned to Brooks Automation, which holds all substantial rights and interests in the '590 Patent, including the exclusive right to sue Persimmon for infringement and recover damages.

### *Persimmon's Access to Brooks Automation's Confidential Information and Trade Secrets*

15.     Persimmon was founded by an ex-Brooks Automation employee, Michael W. Pippins, and incorporated on or about July 8, 2010. Prior to founding Persimmon, Mr. Pippins was employed by Brooks Automation for nearly 17 years (from March 1992 to January 2009). Mr. Pippins started at Brooks Automation as a Director of Sales and Marketing. In 1993, he obtained the title of Vice President of Sales and Marketing and, in May 2002, the title of Senior Vice President and Chief Marketing Officer. Mr. Pippins was terminated by Brooks Automation in January 2009. He is now the CEO of Persimmon.

16.      Persimmon's management team is now made up of several other former senior employees of Brooks Automation – all of which obtained their intimate knowledge of vacuum robots through their work at Brooks Automation.

17.     For example, Persimmon's Vice President, Chris Hofmeister (the sole inventor on Brooks Automation's '590 Patent), had been employed by Brooks Automation for nearly 18 years (from June 1991 to March 2009) before joining Persimmon.

18.     Mr. Hofmeister started at Brooks Automation in 1991 as a Senior Mechanical Engineer, responsible for the design and development of new and existing Brooks Automation robots.

19.     In 1996, while employed at Brooks Automation, Mr. Hofmeister obtained his *Juris Doctor* degree from the Massachusetts School of Law, specializing in patent law, and

became licensed to practice as an attorney in Massachusetts, New Hampshire and before the United States Patent and Trademark Office.  After obtaining his *JD* degree, Mr. Hofmeister accepted a part-time position at Brooks Automation as Director of Strategic Technology, reporting to Michael Pippins, and was given responsibility for the management of Brooks Automation's patent and trademark portfolios.  Upon information and belief, Mr. Hofmeister was also working for the law firm of Perman & Green, LLP during that time.  During that time, Perman & Green served as outside counsel to Brooks Automation with respect to patent and other intellectual property matters.

20.     In June 2001, Mr. Hofmeister accepted a part-time position at Brooks Automation as Director of Strategic Technology for the Factor Interface Business Unit, reporting to Michael Pipppins.  Upon information and belief, while employed as Director of Strategic Technology for Brooks Automation, Mr. Hofmeister continued to work for Perman & Green, LLP.

21.     In April 2002, Mr. Hofmeister accepted a full-time position at Brooks Automation as the Senior Vice President of Engineering for the Vacuum Business Unit (VBU).  As Senior Vice President for VBU, Mr. Hofmeister continued to have responsibility for Brooks Automation's long term R&D programs, IP portfolio development and technology roadmap development.

22.     Upon information and belief, in his roles as Director of Strategic Technology and Senior Vice President of Engineering, Mr. Hofmeister frequently acted as Brooks Automation's attorney in intellectual property matters and gained intimate knowledge of Brooks Automation's existing patent portfolio, including the '590 Patent.

23.     In addition, during the course of his nearly 18 years of employment at Brooks Automation (in both his technical and legal roles), Mr. Hofmeister had access to many (if not all)

of Brooks Automation's most sensitive and valuable confidential information and trade secrets. For example, Mr. Hofmeister had access to highly confidential technical documents, including but not limited to product specifications, requirement forms, engineering notebooks, invention disclosure forms, and draft patent applications related to all aspects of Brooks Automation's products, product ideas, inventions and internal processes. In his legal and technical roles, Mr. Hofmeister regularly advised Brooks Automation on strategic technical matters involving the evaluation of intellectual property. In this dual capacity – legal and technical – Mr. Hofmeister was regularly exposed to and trusted with Brooks Automation's confidential information and trade secrets – including information that was subject to the attorney-client privilege.

24.    On or about November 30, 2005, Mr. Hofmeister signed an Executive Invention, Nondisclosure, Noncompetition and Nonsolicitation Agreement with Brooks Automation which stated:

1. Inventions and Patents

(a) I will promptly and fully disclose to the Company any and all inventions, discoveries, trade secrets and improvements, whether or not patentable and whether or not they are made, conceived or reduced to practice during working hours or using the Company's data or facilities, which I develop, make, conceive or reduce to practice during my employment by the Company, either solely or jointly with others (collectively, the "Developments"). All Developments shall be the sole property of the Company, and I hereby assign to the Company, without further compensation, all my right, title and interest in and to the Developments and any and all related patents, patent applications, copyrights, copyright applications, trademarks, trademark applications and trade names in the United States and elsewhere.

(b) I will assist the Company in obtaining and enforcing patent, copyright and other forms of legal protection for the Developments in any country. I understand that my obligations under this Paragraph 1 still continue after the termination of my employment with the Company. In addition to my agreements set forth above, I hereby constitute and appoint the Company, its successors and assigns, my true and lawful attorney, with full power of substitution for me, and in my name, place and stead or otherwise, but on behalf of and for the benefit of the Company, its successors and assigns, to take all actions and execute all documents on behalf of

me necessary to effect the assignment set forth in subparagraph 1(a) and I hereby declare that the appointment hereby made and the powers hereby granted are coupled with an interest an dare and shall be irrevocable by me in any manner or for any reason.

25.     On or about March 9, 2009, Mr. Hofmeister resigned as Senior Vice President at Brooks Automation and became an independent consultant to Brooks Automation.  At that time, Mr. Hofmeister signed a two-year Consulting Agreement with Brooks Automation, effective March 9, 2009 to March 8, 2011, pursuant to which Mr. Hofmeister agreed to provide advice regarding, among other things, the development of intellectual property and innovations that could lead to the development of intellectual property, intellectual property portfolio analysis, intellectual property infringement analysis, intellectual property prosecution review, the development of disclosures for use in intellectual property evaluation, and participation in or leadership of patent committee meetings.   Pursuant to the Consulting Agreement, Mr. Hofmeister was very highly compensated by Brooks Automation for his consulting services.

26.     Upon information and belief, Mr. Hofmeister is now responsible for new product and intellectual property development and management at Persimmon.

27.     Persimmon's Chief Technology Officer, Dr. Martin Hosek, began his career at Brooks Automation in June 1997 and was employed at Brooks Automation for nearly thirteen years.  During his employment at Brooks Automation, Dr. Hosek held the positions of Controls Engineer, Senior Control Engineer, Manager of Controls Engineering, Director of Controls Engineering, Vice President of Robots and Controls Engineering of the Automation Systems Group, and VP of Hardware Engineering and Technology of the Critical Solutions Group.  At various times during his career at Brooks Automation, Dr. Hosek reported directly to Mr. Hofmeister.

28.     Dr. Hosek's Employee Non-Disclosure Agreement, signed June 9, 1997, stated:

I hereby recognize as the exclusive property of, and assign, transfer, and convey to my employer without further consideration such invention, discovery or improvement (collectively called inventions) made, conceived or developed by me (whether alone or jointly with others) during the period of my employment which relates in any way to my work at Brooks Automation, Inc., or any of its subsidiaries, or to the business, work, interesting or investigations of my employer. I will communicate to my employer promptly and fully, and preserve as confidential information of my employer, all such inventions. . . I will not disclose, or make any use of except for my employer, at any time during the period of, or subsequent to, my employment with my employer, any confidential information, knowledge, trade secrets, or data of my employer I may produce or obtain during the period of my employment unless and until that information shall have become public knowledge. **Upon request by my employer, I will at any time execute documents assigning to it, or its designees, any such invention or any patent application or patent granted therefore, and will execute any papers relating thereto.**

29.     On or about March 4, 2010, Dr. Hosek executed a Separation Agreement with Brooks Automation, whereby Dr. Hosek acknowledged that his Employee Non-Disclosure Agreement signed June 9, 1997 would remain in full force after his separation.  Additionally, Dr. Hosek agreed that for a period of one year, he would not consult with or in any way aid or assist any direct or indirect competitor to Brooks Automation.  Dr. Hosek further agreed that his participation in the filing of any patent or provisional patent application in any jurisdiction for inventions related to the business of Brooks Automation would amount to competing activity.

30.     On March 31, 2011, pursuant to the obligations set forth in Dr. Hosek's Employee Non-Disclosure Agreement (which require him to, *at any time*, execute documents assigning to the company any invention made, conceived or developed by Dr. Hosek during the period of his employment), Dr. Hosek signed his name as an inventor on Brooks Automation Invention Disclosure Form, entitled "A Direct Drive Robot with Reluctance Based Actuation and Sensing Method of Controlling Thereof," indicating that the invention disclosed therein had been conceived by employees of Brooks Automation in 2006 (the "Invention Disclosure Form").

31.     The Invention Disclosure Form discloses, among other things, an improvement on Brooks Automation's signature direct drive technology, including for example, a drive section with variable (switched) reluctance motors.  As set forth in the Invention Disclosure Form, a reluctance motor is an electric machine in which torque is produced by the tendency of its movable part, e.g., a rotor, to move to the minimum reluctance position at the instance of excitation.  At the time the Invention Disclosure form was prepared, Brooks Automation's vacuum robots employed motors with a stator located in the atmosphere outside the vacuum to create a magnetic field capable of powering the rotation of a rotor with permanent magnets located inside the vacuum.  The Brooks Automation Invention Disclosure Form signed by Dr. Hosek, however, proposed eliminating the presence of magnets from the rotor of the motor in order to eliminate exposure to potentially corrosive elements.

32.     The Invention Disclosure Form contained confidential information and trade secrets that are competitively sensitive, highly confidential and owned by Brooks Automation, and which are subject to the express terms of the nondisclosure agreements signed by Dr. Hosek and Mr. Hofmeister.

33.     Ideas contained in the Invention Disclosure Form also have independent economic value by virtue of not being known to competitors of Brooks Automation, including Persimmon, who could obtain economic value from their disclosure or use, including by disclosing the ideas in a patent application and by attempting to use the ideas to unfairly compete with Brooks Automation in the market.  For example, as evidenced by the Invention Disclosure Form itself, Brooks Automation originally assigned the invention captured in the form an Expected Value Code of "C4$$ if utilized in next-generation vacuum robot."  As evidenced by the Invention Disclosure Form, an Expected Value of C4$$ indicates that the invention is "in

planned product development," "has a high likelihood of future infringement or license potential," and has a revenue potential of more than $20 million per year.

34.     On April 22, 2011, Dr. Hosek informed Brooks Automation that he had accepted a position with Persimmon starting on April 25, 2011.  Dr. Hosek further acknowledged that his Employee Non-Disclosure Agreement with Brooks Automation continued to be in effect.

### *Persimmon's Use of the Brooks Automation Trade Secrets and Confidential Information*

35.     On September 16, 2011, Persimmon filed a provisional application for a United States Patent entitled Vacuum-Compatible Direct-Drive System" (Application No: 61/627/030) ("the '030 Provisional Application").  The '030 Provisional Application, listed Dr. Hosek and Tuan Ha (a former Principal Mechanical Engineer at Brooks Automation) as inventors.

36.     Material portions of the '030 Provisional Application were directly copied from the Brooks Automation Invention Disclosure Form signed by Dr. Hosek on March 31, 2011. Specifically, at least three pages of the '030 Provisional Application were copied verbatim from the section entitled, "Departure from Existing Methods/Uniqueness," in the Brooks Automation Invention Disclosure Form signed by Dr. Hosek on March 31, 2011.  Upon information and belief, Mr. Hosek and/or Mr. Hofmeister wrongfully retained a copy of the Invention Disclosure Form after his employment with Brooks Automation had ended, and then knowingly and intentionally copied sections of the Invention Disclosure Form word-for-word into the '030 Provisional Application.

37.     On August 15, 2012, Persimmon filed provisional patent application No. 61/683,297 ("the '297 Provisional Application"), listing Dr. Hosek, Mr. Hofmeister and Mr. Ha as inventors.

38.     On September 14, 2012, Persimmon filed U.S. Application No. 13/618,315 ("the '315 Application"), entitled "Robot Drive with Passive Rotor" listing Dr. Hosek, Mr. Hofmeister,

Mr. Ha and Dennis Poole (another former employee of Brooks Automation), as inventors and Persimmon as assignee.  The '315 Application claims priority to the '030 and '297 Provisional Applications and incorporates them by reference but, unlike the '030 Provisional Application, does not itself contain the language copied from the "Departure from Existing Methods/Uniqueness" Section of the Brooks Automation Invention Disclosure Form signed by Dr. Hosek on March 31, 2011.  The '315 Application was published on or about March 21, 2013.

39.     Claim 1 of the '315 Application as originally submitted to the United States Patent and Trademark Office ("USPTO") claims:

> A substrate transport apparatus comprising:
> a drive section comprising a first motor, where the first motor comprises a stator
>     and a passive rotor; and
> a first movable arm assembly connected to the first motor,
>     where the substrate transport apparatus is configured for the first movable arm
>     assembly to be positionable in a vacuum chamber with the passive rotor being
>     in communication with an environment inside the vacuum chamber.

40.     As set forth in paragraph 0075 of the specification of the '315 Application, the "passive rotor" of Claim 1 need not contain permanent magnets.  Notably, during prosecution of the '315 Application, the applicants amended Claim 1 to definitively state that the "passive rotor" in fact does not contain permanent magnets.

41.     As set forth in Paragraph 31 above, a substrate transport system having a reluctance motor that does not rely on permanent magnets was also disclosed in the Brooks Automation Invention Disclosure Form signed by Dr. Hosek on March 20, 2011.

42.     Persimmon has now disclosed valuable Brooks Automation inventions to the world in a public patent application in an attempt to claim ownership over ideas owned by and stolen from Brooks Automation.  Persimmon has pursued the prosecution of these patents on its

behalf despite both Dr. Hosek and Mr. Hofmeister having signed agreements expressly acknowledging that any such inventions were owned exclusively by Brooks Automation.

43.     In addition, upon information and belief, Persimmon is now using Mr. Hofmeister's and Dr. Hosek's intimate knowledge of Brooks Automation's products and engineering practices (including knowledge gained by Mr. Hofmeister by virtue of his direct and continuous access to Brooks Automation's highly confidential and trade secret materials, including but not limited to, product specifications, requirement forms, engineering notebooks, invention disclosure forms, patent applications, and prototypes, while in his dual roles as lawyer and engineer at Brooks Automation) to manufacture products that directly compete with Brooks Automation in the market.

44.     For example, upon information and belief, Persimmon now makes and offers for sale a vacuum robot that is the same or substantially similar to the MagnaTran® 8 vacuum robot sold by Brooks Automation.  For example, upon information and belief, the Persimmon vacuum robot has the same form factor, is the same size as, and is of similar construction to the MagnaTran® 8 Vacuum Robot sold by Brooks Automation.   Upon information and belief, Persimmon's vacuum robot also has a Selective Compliance Articulated Robot Arm (SCARA) coupled to a coaxial motor, as does the MagnaTran® 8 Vacuum Robot sold by Brooks Automation.

45.     The MagnaTran® 8 Vacuum Robot sold by Brooks Automation is protected by the '590 Patent.

46.     Upon information and belief, Persimmon's Chief Technology Officer, Dr. Martin Hosek, and Vice President, Chris Hofmeister, have visited at least one customer of Brooks Automation on several occasions.  Upon information and belief, during at least one of those

visits, Dr. Hosek wrongfully suggested to that customer that there were issues with Brooks Automation's vacuum robots for which Dr. Hosek had been responsible while employed at Brooks Automation.  Upon information and belief, on another visit to the same customer, Mr. Hofmeister erroneously informed that customer that the Persimmon vacuum robot did not infringe Brook Automation's intellectual property.

47.     Persimmon's infringement of the '590 Patent, disclosure of Brooks Automation's valuable trade secrets and confidential information in the '315 Application, and use of Brooks Automation's valuable trade secrets and confidential information (as obtained by Dr. Hosek and Mr. Hofmeister during the course of their employment at Brooks Automation) in the manufacture of Persimmon products demonstrates a purposeful scheme by Persimmon to use intellectual property stolen from Brooks Automation in order to directly and illegally compete with Brooks Automation in the market.  Such wrongful activities must be halted.

## FIRST CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,720,590)

48.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

49.     On information and belief, Persimmon has infringed and continues to infringe one or more claims of the '590 Patent pursuant to 35 U.S.C. § 271(a), literally or under the doctrine of equivalents, by making, using, selling, offering for sale and/or importing vacuum robotic products.

50.     On information and belief, Persimmon has willfully infringed and continues to willfully infringe the '590 Patent.  On information and belief, Persimmon has had actual notice of the '590 Patent at least as of the time Mr. Hofmeister joined Persimmon.

51.     Brooks Automation has been damaged as a result of Persimmon's infringing conduct.  Persimmon is, therefore, liable to Brooks Automation in an amount that adequately compensates Brooks Automation for Persimmon's infringement which, by law, cannot be less than a reasonable royalty, together with interest and costs as fixed by this Court under 35 U.S.C. § 284.

### SECOND CAUSE OF ACTION

**(Declaratory Judgment of Ownership of U.S. Patent Application No. 13/618,315)**

52.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

53.     The Executive Invention, Nondisclosure, Noncompetition and Nonsolicitation Agreement entered into between Brooks Automation and Christopher Hofmeister, dated November 30, 2005 ("the Hofmeister Agreement") is a valid and enforceable contract and Mr. Hofmeister is bound by the terms of that agreement.

54.     Under the terms of the Hofmeister Agreement, all inventions, discoveries, trade secrets and improvements developed, made, conceived or reduced to practice by Mr. Hofmeister, solely or in combination with others, during the term of his employment at Brooks Automation is the sole property of Brooks Automation.

55.     The Employee Non-Disclosure Agreement between Dr. Hosek and Brooks Automation, dated June 9, 1997 ("the Hosek Agreement"), which remains in full force and effect as acknowledged by Dr. Hosek in his Separation Agreement entered into between Brooks Automation and Dr. Hosek fully executed on or about March 11, 2010, is a valid and enforceable contract and Dr. Hosek is bound by the terms of that agreement.  As acknowledged by Dr. Hosek in the Separation Agreement entered into between him and Brooks Automation and fully executed on or about March 11, 2010, the Hosek Agreement remains in full force and effect.

56.     Under the terms of the Hosek Agreement, Dr. Hosek agreed that all inventions, discoveries or improvements made, conceived or developed by Dr. Hosek (alone or jointly with others) during the period of his employment at Brooks Automation that  relate in any way to the business, work, interests or investigations of Brooks Automation is the exclusive property of Brooks Automation.

57.     The Brooks Automation Invention Disclosure Form signed by Dr. Hosek on or about March 30, 2011 discloses a substrate transport system having a reluctance motor that does not rely on permanent magnets.

58.     The '315 Application similarly discloses and purports to claim a "passive rotor" that does not rely on permanent magnets.

59.     Pursuant to Mass Gen. Law 231A, Brooks Automation is entitled to a declaratory judgment that Brooks Automation is the owner of the '315 Application.

### THIRD CAUSE OF ACTION

**(Misappropriation of Confidential Information and Trade Secrets – Common Law)**

60.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

61.     As a result of the conduct described above, Persimmon has misappropriated Brooks Automation's confidential information and trade secrets, including, but not limited to, the information contained in the March 31, 2011 Invention Disclosure Form.

62.     That information is confidential, competitively sensitive, and owned by Brooks Automation.  It has independent economic value by virtue of not being known to Brooks Automation's competitors, including Persimmon.

63.     Brooks Automation takes, and at all relevant times has taken, reasonable steps to safeguard the secrecy of its confidential information and trade secrets, including, but not limited

to, requiring employees, customers, partners, and vendors to sign non-disclosure agreements, password protecting its computer systems and implementing stringent electronic data and physical security measures at all of its facilities.

64.     Persimmon was made aware and knew that use or disclosure of Brooks Automation's confidential information and trade secrets was prohibited.

65.     As described above, Persimmon, on information and belief, knowingly assisted its employees, including Dr. Hosek and Mr. Hofmeister, in using, and disclosing Brooks Automation's confidential information and trade secrets for Persimmon's benefit, without Brooks Automation's express or implied consent.

66.     As a result of Persimmon's misappropriation of Brooks Automation's confidential information and trade secrets, Brooks Automation has suffered and will continue to suffer harm, including actual loss.

## FOURTH CAUSE OF ACTION

### (Misappropriation of Trade Secrets - M.G.L. Ch. 93, § 42 and 42A)

67.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

68.     Brooks Automation has information, tangible or intangible or electronically kept or stored, that constitutes, represents, evidences or records a secret scientific, technical, merchandising, production, or management information, design, process, procedure, formula, invention or improvement.

69.     This information is used in Brooks Automation's business and it has independent economic value by virtue of not being known to Brooks Automation's competitors, including Persimmon.

70.     Brooks Automation takes, and at all relevant times has taken, reasonable steps to preserve the secrecy of that information.

71.     Persimmon, on information and belief, stole, unlawfully took, carried away, concealed, copied, or otherwise used this information from Brooks Automation, with the intent to convert that information to Persimmon's own use.  This conduct was willful, knowing, and/or in bad faith.

72.     Persimmon's conduct violates the Massachusetts Trade Secrets Act, M.G.L. ch. 93, §§ 42 and 42A.

73.     As a result of Persimmon's conduct, Brooks Automation has suffered and will continue to suffer irreparable harm that cannot be adequately addressed at law.  Unless injunctive relief is granted, Brooks Automation will be irreparably harmed in a manner not fully compensable by money damages.

## FIFTH CAUSE OF ACTION

### (Tortious Interference with Contractual Relations)

74.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

75.     As a result of the conduct described above, Persimmon has tortiously interfered with Brooks Automation's contractual relations with its former employees, including Dr. Hosek and Mr. Hofmeister.

76.     Dr. Hosek and Mr. Hofmeister entered into valid, binding and enforceable Agreements with Brooks Automation whereby they were obligated, in relevant part, to assign to Brooks Automation all inventions, discoveries, trade secrets and improvements developed by them during their employment at Brooks Automation.

77.     Persimmon (whose key management now includes Dr. Hosek and Mr. Hofmeister) clearly knew of those Agreements.

78.     On information and belief, Persimmon knowingly, intentionally, and improperly induced the former employees to breach those Agreements before and during their work for Persimmon despite its knowledge that the conduct was unlawful, and then used Brooks Automation's confidential information and trade secrets to compete with Brooks Automation in the market.

79.     Persimmon maintained an improper motive and used improper means in interfering with Brooks Automation's contractual relationships without lawful justification or legitimate reason.  The improper motive includes, but is not limited to, Persimmon's desire to use and to possess Brooks Automation's confidential information and trade secrets to compete with Brooks Automation in the market.

80.     As a direct and proximate result of Persimmon's actions described above, Brooks Automation suffers and continues to suffer irreparable harm and money damages.

### SIXTH CAUSE OF ACTION

**(Tortious Interference with Advantageous Business Relationships)**

81.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

82.     As described above, Brooks Automation has established a leading reputation in the field of automation.

83.     Persimmon viewed Brooks Automation as its primary competitor for potential customers, and knew of Brooks Automation's existing, advantageous relationships with those customers.

84.     Persimmon intentionally interfered with those advantageous relationships through improper motives and means.  Specifically, on information and belief, Persimmon knew of, and directed, Mr. Hofmeister and Dr. Hosek to use Brooks Automation confidential information and trade secrets in soliciting those customers.

85.     Brooks Automation has suffered, and will continue to suffer, actual harm as a result of Persimmon's tortious interference with its advantageous business relationships.

## SEVENTH CAUSE OF ACTION

### (Aiding and Abetting Misappropriation of Trade Secrets)

86.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

87.     On information and belief, Persimmon was aware of the misappropriation of Brooks Automation confidential information and trade secrets that is described above, and it knowingly and actively participated in or substantially assisted Dr. Hosek and Mr. Hofmeister in their use of that information, including to manufacture products based on Brooks Automation's confidential information and trade secrets and to actively solicit other Brooks Automation customers.  Persimmon encouraged and substantially assisted Dr. Hosek and Mr. Hofmeister in these activities with full knowledge that the former employees were breaching a legal duty to Brooks Automation.

88.     As a direct and proximate result of Persimmon's aiding and abetting the former employees' misappropriation, Brooks Automation has been injured and Persimmon has been and will continue to be unjustly enriched.

## EIGHTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty)

89.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

90.     Mr. Hofmeister acted as an attorney to Brooks Automation and, therefore, was in a position of trust and confidence and owed Brooks Automation fiduciary duties of care, confidentiality and loyalty.

91.     Mr. Hofmeister breached his fiduciary duty by disclosing to Persimmon confidential information provided to him by Brooks Automation in his capacity as Brooks Automation's attorney, including but not limited to Brooks Automation's confidential information contained in product specifications, requirement forms, invention disclosures, engineering notebooks, and draft patent applications.

92.     Persimmon was aware that Mr. Hofmeister was committing a breach of his fiduciary duty to Brooks Automation.

93.     Persimmon actively participated or substantially assisted in or encouraged the breach to the degree that Persimmon could not reasonably be held to have acted in good faith.

94.     As a direct and proximate result of Persimmon's aiding and abetting Mr. Hofmeister's breach of his fiduciary duty to Brooks Automation, Brooks Automation has suffered, and will continue to suffer, substantial injury.

## NINTH CAUSE OF ACTION

### (Unjust Enrichment)

95.     The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

96.     As a result of the conduct described above, including Persimmon's intentional interferences with contractual relationships and misappropriation of Brooks Automation confidential information, property and trade secrets, Persimmon received a benefit from Brooks Automation, including but not limited to, business opportunities, revenue, funding and increased market share, to which Persimmon was not entitled.

97.     Persimmon has improperly, and without consent by Brooks Automation, retained this Brooks Automation property, as well as revenues derived from such Brooks Automation property, to which it was not entitled.

98.     Persimmon had, and has, no legitimate entitlement to this Brooks Automation property or the revenues derived from such Brooks Automation property.

99.     On information and belief, Persimmon has continued to use the ill-gotten property and revenues for its own benefit.

100.    The taking and retention of this benefit is both inequitable and unjust.

101.    As a direct and proximate result of Persimmon's unjust enrichment, Brooks Automation has suffered substantial injury, including but not limited to loss of customers and market share.

102.    Persimmon's actions have been willful and outrageous and undertaken with reckless indifference to the rights of Brooks Automation.

## TENTH CAUSE OF ACTION

### (Violation of Mass. Gen. Laws c. 93A, §§ 2 and 11)

103.    The allegations of the preceding paragraphs are incorporated by reference as if set forth fully herein.

104.    Brooks Automation is a "person" and engages in "trade or commerce" within the meaning of Mass. Gen. Laws c. 93A, § 1. Persimmon is a "person" and engages in "trade or commerce" within the meaning of M.G.L. c. 93A, § 1.

105.    The conduct constituting violations of M.G.L. c. 93A occurred primarily and substantially in Massachusetts.

106.    Persimmon's activities as set forth above constitute willful and knowing violations of M.G.L. c. 93A, §§ 2 and 11.

107.    As a result of Persimmon's violations of M.G.L. c. 93A, §§ 2 and 11, Brooks Automation has suffered monetary damages and has suffered substantial and irreparable injury and is threatened with further substantial and irreparable harm, for which there is no adequate remedy at law to compensate.

## Jury Demand

Brooks Automation demands a trial by jury as to all claims that may be tried to a jury.

## Prayers For Relief

WHEREFORE, Plaintiff Brooks Automation Corporation respectfully requests that this Court enter judgment in its favor and grant permanent injunctive relief as follows:

A.    Enter judgment in Brooks Automation's favor on each Count set forth above in this Complaint;

B.    Award Brooks Automation damages, in an amount to be proven at trial, caused by Persimmon's unlawful conduct;

C.    Award Brooks Automation double, treble and/or punitive damages as permitted by applicable law, including under M.G.L. c. 93A, §§ 2 & 11 and 35 U.S.C. §284;

D.    Enter judgment declaring that Brooks Automation is the sole and rightful owner of the '315 Application;

E.    Enter a Permanent Injunction enjoining Persimmon, and its officers, agents and employees, and other persons who are in active concert or participation with them, from (1) disclosing, using or possessing any Brooks Automation

confidential information and trade secrets, (2) unlawfully interfering with, or inducing former Brooks Automation employees to breach, any Brooks Automation Executive Invention, Nondisclosure, Noncompetition and Nonsolicitation Agreement, and (3) unlawfully interfering with Brooks Automation's advantageous business relationships;

E.     Enter an order directing Persimmon to return any and all Brooks Automation confidential information and property in its possession, custody or control;

F.     Award Brooks Automation its costs of suit and attorney fees as permitted by applicable law;

G.     Grant Brooks Automation prejudgment and post-judgment interest; and

H.     Award any other remedy and/or relief that the Court deems just and equitable in the circumstances.


                    Respectfully Submitted,

                    CHOATE HALL & STEWART LLP


                    */s/ Margaret E. Ives*
                    Michael H. Bunis (BBO No. 566839)
                    Carlos Perez-Albuerne (BBO No. 640446)
                    Margaret E. Ives (BBO No. 668906)
                    Two International Place
                    Boston, Massachusetts  02110
                    Tele: (617) 248-5000
                    Fax: (617) 248-4000
                    mbunis@choate.com
                    cperez@choate.com
                    mives@choate.com


Dated:  November 24, 2014         *Counsel for Plaintiff Brooks Automation Corporation*